(33 App. Div. 356.)

### LAWLOR v. MAGNOLIA METAL CO.

(Supreme Court, Appellate Division, First Department.    October 14, 1898.)

1. SALES—CONTRACTS—CONSTRUCTION—RESCISSION.
     A selling contract provided that in case of its breach delivery should be made under a former contract between the same parties, which provided for its termination on notice in case of its breach. The buyer having broken the last-made contract, the seller stored the goods to the buyer's account, and drew on him for the price. Payment was refused, and the seller then notified him that delivery thereafter would be made under the first contract, and afterwards that because of its breach that contract would be rescinded. The buyer then offered to accept the goods under the last-made contract. *Held*, that the offer was too late.

2. SAME.
     Where a contract has been broken, and the party not in default has elected to enforce it, and the breach continues, he is not bound by his election, but may then rescind it.

3. SAME—REVIVAL OF CONTRACT.
     The parties to a running contract for the delivery of goods during its life made a new contract for the sale of the same goods, and the buyer gave an order thereunder, stating that, if only a portion of the goods ordered were taken, the balance should not apply under the former contract. The seller replied that the first contract had to be considered in force if the second were broken, and the buyer assented. *Held*, that the seller had a right to revive the first contract on breach of the second.

4. SAME—BREACH—DAMAGES.
     Where a selling contract provided that, in case of its breach by the buyer, delivery should be made under a prior contract between the same parties, and after revival of the prior contract through breach of the former it also was broken, damages for failure to receive the goods could be recovered under only one contract.

5. SET-OFF—WHEN PROPER—DIFFERENCE IN PARTIES.
     After a firm made a contract, a new member was added; and it made a new contract with the same parties relative to the same subject-matter,

which provided that in case of its breach the first contract should be revived. *Held*, that damages for the firm's breach of the first contract, which had been revived by its breach of the second, were a proper counterclaim in an action by the new firm to recover advancements made under the second contract.

Appeal from judgment on report of referee.

Action by James Lawlor against the Magnolia Metal Company. There was a judgment for plaintiff on the decision of a referee, and defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Alexander S. Bacon, for appellant.

L. A. Gould, for respondent.

O'BRIEN, J. The plaintiff, assignee of an English firm known as the Magnolia Antifriction Metal Company of Great Britain, brought this action to recover money advanced by said firm to the Magnolia Metal Company, defendant, in payment of metal which was to be delivered to the English firm by a contract entered into between them in 1894, which contract was never completely carried out. The answer of the defendant alleged breach of the contract by the English firm, and made counterclaim arising from such breach. The referee held that, although the English firm broke the contract referred to, the defendant had elected to waive such breach, and that thereafter, without further default of the English firm, and after their offer to carry out the contract, the defendant refused to recognize the contract as still existing, and thereby became liable for the return of certain advance payments made by the English firm in pursuance of the contract. The counterclaims were dismissed upon the merits.

On the trial the following facts appeared: The defendant and the English firm had made a contract consisting of an agreement dated February 16, 1894, modified by letters dated March 27, 28, and 29, 1894, which provided that the defendant was to furnish the English firm with 3,000,000 pounds of Magnolia metal, at 10 cents a pound, to be taken within one year from March 1, 1894, or else within two years, provided the English firm paid 4 cents a pound at the end of the first year for metal not then taken; the balance of metal to be taken and paid for completely in quarterly installments. The English firm elected to take the metal in two years, made $35,710.40 advance payments, and received metal up to the second quarterly installments of the second year, leaving 900,000 pounds undelivered. The contract thus entered into provided, further, that if, for any reason, the English firm should fail in carrying out the contract, any portion of the amount of metal therein stipulated and ordered should not apply under a previous contract of March 25, 1891, but also that if the English firm should fail to accept delivery, or to make due payment therefor, the contract should be terminated, and the contract of March 25, 1891, must then be considered as still in existence, and delivery of metal as therein required considered to be due from March 1, 1894. The contract of March 25, 1891, referred to, had been entered into between a New York corporation, assignor of defendant, and two

members of the English firm. It created an English agency for 21 years, and provided for the monthly delivery during four years, beginning March 25, 1891, of 10 tons of metal at 13 cents a pound, and for the delivery thereafter of metal at 12 cents a pound, unless otherwise requested by the English agents. This contract gave the American company power, in the event of the English agents failing to order metal as agreed for any three months, to give the agents three months' notice to terminate the contract, and to take possession of the English business. The second installment of metal of the second year being due and ready for delivery under the contract of 1894, the English firm notified the defendant, by cablegram dated September 12, 1895, that it refused to accept delivery, or to make payment therefor, unless defendant would pay certain expenses of patent litigation. It appears that the defendant had agreed to defend suits, and at this time was in controversy with its English attorneys as to the exact amount due for professional services. The American company was clearly liable, on the evidence, to pay such charges; but it is conceded that it was plainly a breach of contract of the English firm to demand that payment as precedent to accepting delivery of metal under the contract. The defendant replied to this cablegram of the English firm that the second installment of metal had been stored to the account and at the risk of the English firm, and sight draft made for payment. The English firm replied by refusing to pay all drafts, or to have any further dealings with the defendant except on conditions mentioned. This position the English firm steadfastly maintained, and in every instance coupled its orders with such conditions down to its unconditional offer of November 19, 1895, to continue the contract. In the meantime, on October 4 and October 5, 1895, by cable and letter the defendant notified the English firm that as they had failed to take and pay for metal on the 1st of September, as required by the contract of 1894, an order subsequently received, designated as the "Genoa order," would be shipped under the contract of March 25, 1891, and that the English firm was required to immediately take and pay for balance of metal from March 1, 1894, under that contract, or else the defendant would enforce its rights under that contract by taking possession of the business. This new attitude taken by the defendant was affirmed by its letter of October 29th, also previous to the English firm's unconditional offer of November 19th, by which the English firm was duly notified that under the terms of the contract dated March 25, 1891, three months' notice was given to terminate said contract, and demand was made for the immediate payment to defendant of $31,000 damage for the nonfulfillment of said contract. The English firm replied to this letter, claiming that the defendant, by so holding the contract of 1891 to be in force, had made further breach of the 1894 contract. There was no change in the position of the parties until the English firm, by its attorney, wrote to the defendant on November 19, 1895, offering to carry out the 1894 contract without condition. To this offer the defendant, by attorney, replied on November 21st, reviewing its position taken on October 5th, and declaring that the English firm were held by the terms of the 1891 contract. The English firm in reply insisted that the 1891 con-

tract had been superseded, and could in no way be revived. On February 21, 1896, the defendant notified the English company that they having failed to perform the contract of March 25, 1891, and three months' notice as required having been duly given, the defendant took possession of the English business. By letter of February 24th the English firm contended, on the other hand, that the American company had forfeited its right to the English business. The English firm, however, on February 28th, made a formal, unconditional offer to carry out the 1894 contract, to which the defendant replied that the offer came too late.

The defendant makes three counterclaims as follows: The first counterclaim includes $15,000 damage for nonacceptance of 900,000 pounds of metal called for by the contract of 1894, and $40,000 damage for nonacceptance of 230 tons of metal called for by the contract of 1891, and the contract of 1894 for metal due from March 1, 1894. The second counterclaim is for $760.70 advanced to a patent expert sent to America by the English attorneys, and alleged by the defendant to have been agent for the English firm. The third counterclaim is for $1,534.60 unpaid by the English firm for metal received, which sum the English firm had paid to the English attorneys. The evidence on the trial clearly showed that the defendant was liable for the amounts set forth in the second and third counterclaims.

It is conceded that by the letter of the London firm, refusing to accept the drafts drawn by the defendant for the second installment of the metal, payable under the contract, the London firm was guilty of a breach of the contract. It further appears that this position was not only adhered to, but emphasized by the subsequent conduct of the London firm in refusing to perform any part of the contract, and neglecting to pay after notice that the metal had been stored for their account and a draft drawn for the purchase price. These repeated breaches left it optional with the defendant, the American company, either to rescind the contract on its part, or to elect to treat it as subsisting and enforce its rights against the London company under the contract. The real question, therefore, to be determined, is, did the defendant, the American company, make an election; and, if so, what election; and was the attitude which it thus assumed consistently adhered to down to the time when, as claimed, the London firm receded from its original position, and wrote expressing its willingness to go on with the contract, to receive the metal, and to pay for it?

The law governing the rights of the parties is well settled. Upon a breach by one party to a contract, the other party thereto has an election, but the authorities agree in holding that such election must be made immediately. The London firm being guilty of a breach, and of repeated breaches, which gave the American company the right to elect, we may concede that legally such election accrued, not only upon the original breach, but also at the subsequent breaches. It is insisted that the position assumed by the American company, of treating the contract as subsisting under its election, was consistently adhered to down to the time the London firm changed its position, and gave notice that it was willing to go on with the contract. If

the evidence supports this view, then it is clear that, under the doctrine of election and waiver, the London firm had the right legally to recede from its first position, and accede to the demands made by the American company, that they should comply with and carry out the terms of the agreement.  There can be no question as to the attitude of the American company in adhering to its position that the contract of 1894 was a subsisting one down to October 4, 1895, when, by a cablegram, which was followed by a letter of October 5th, the American company changed its position, in one aspect, by taking advantage of another provision in the 1894 contract, that upon a failure of the London company to comply with the contract of 1894 then the contract of 1891 should be revived, and that thereafter it would apply orders of the London company for metal under the contract of 1891. With respect to the right to resort to the contract of 1891, while the "provisional contract" of 1894 permitted it, our attention is called to the letter of the London company of March 27, 1894, bearing upon this question, which provides "that if, for any reason, [the London company] fail in carrying out the above-given order, any portion of it we may have given shall not apply under contract of 1891."  To this, however, we have the subsequent reply of the American company, dated March 28, 1894, that in the event of the failure of the London company to carry out the terms of the 1894 contract the contract of 1891 must be considered as still in existence, under which deliveries should be due.   This the London company assented to, by saying that they accepted the terms as proposed, which would seemingly dispose of the contention that the American company had not the right to resort to the contract of 1891.   The contention of the American company, therefore, that it adhered to the contract of 1894, is based upon their construction of its terms, which, as claimed, permitted them to elect to apply portions of the order for metal pursuant to the 1891 contract.   In this connection attention should be called to the notice of October 29, 1895, of the American company's election to terminate the contract of 1891, which included a demand for $31,000 damages for nonfulfillment.   To summarize, therefore, it appears that the London firm first broke the contract, and the defendant upon such breach elected to regard the contract as a subsisting one, and proceeded to enforce its terms by storing the metal and drawing a draft.   The London firm having consistently refused either to receive the metal or to pay the draft, the defendant subsequently availed itself of a provision in the 1894 contract which gave it the right, upon the nonfulfillment by the London company, to bring into life again the contract of 1891.   This right to revive the contract of 1891 was denied by the London firm, and it was coupled with such denial that thereafter the London firm offered to carry out the contract of 1894. We think that this offer of the London company was too late, and that the defendant had the right, after having endeavored unsuccessfully to enforce the contract of 1894, to resort to the provision therein which permitted the revival of the contract of 1891.   The legal question which thus arises is whether the advanced payment received by the defendant on the 1894 contract was subject to deduction for the damages suffered by the defendant company by reason of the failure of the

London firm to carry out the 1891 contract, and accept delivery of the metal thereunder.

The claim for $15,000 set up in the first counterclaim, for failure to receive the metal under the 1894 contract, falls for the reason that the defendant, having elected to revive the contract of 1891, must look to the damages arising thereunder, and cannot have damages under both contracts. The amount advanced by the London firm, and for which this suit is brought, can, however, I think, be properly offset by the damages due to the breach of the 1891 contract by the plaintiff's assignor. This claim, by the terms of the letters modifying the provisional contract, is for metal to be delivered from March 1, 1894. On October 29, 1895, the defendant gave the plaintiff's assignor three months' notice to terminate the contract of 1891, which would make the contract expire on January 29, 1896. By the terms of the contract of 1891, 10 tons of metal a month, at 13 cents a pound, would need to be delivered up to March 25, 1895, and thereafter at 12 cents a pound, unless due notice to terminate the contract should be given by the English parties. It thus appears that under the contract of 1891 the plaintiff was to take delivery from March 1, 1894, to March 25, 1895, a period of 1 year and 24 days, or 12.9 months, at the rate of 10 tons a month, making 128 tons at 13 cents a pound, amounting to $37,273.60, and from March 25, 1895, to January 29, 1896, a period of 10 months and 4 days, or 10.133 months, making 101.33⅓ tons at 12 cents a pound, amounting to $27,238.32, or a total amount, according to the contract, of $64,511.92. The evidence of the cost of production of the metal during this period is found in the testimony of E. C. Miller, vice president of the American company, viz.: July 1, 1895, to March 1, 1896, cost, 4.15 cents per pound; the year preceding, September 1, 1895, 4.4 cents per pound; July 1, 1895, to October 1, 1895, 4.36 cents per pound. The defendant's claim of average cost for the period covered by the 1891 contract is 4.3 cents per pound;— a total cost on the 229.33⅓ tons of $22,093.89. A proper measure of damages would be the difference between the contract price of metal during that period and the cost of production to the defendant, and accepting the above calculation, gathered from the testimony, the damages thus ascertained would amount to $42,417.24. This sum is the basis of the second item of $40,000 damages set up in the defendant's first counterclaim. The suggestion that such damages would not be a proper counterclaim, because one of the members of the present London firm was not a member of the firm in 1891, I do not regard as sound, for the reason that by the 1894 contract the London firm, as then constituted, in the event of failure to accept metal ordered pursuant to the contract of 1894, agreed to consider metal due from March 1, 1894, according to the terms of the 1891 contract. The two counterclaims for services were correctly disposed of by the referee. He did not, however, consider or determine the damages under the 1891 contract, for the reason that he concluded that the rights of the parties were fixed under the contract of 1894. The conclusion reached by the referee, as shown by his opinion, was materially affected by some expressions in the opinion of this court in Sugden v. Metal Co., 8 App. Div. 288, 40 N. Y. Supp. 956. That was

an appeal from an order denying a motion to continue a preliminary injunction to restrain the defendant, pending the suit, from interfering with the plaintiffs' business. The plaintiffs there were the English firm, the assignors of this plaintiff. The order refusing the injunction was affirmed for the reason that the English firm had assigned the $36,000 to this plaintiff, who had brought this action, which was then pending. It was therein held that the effect of such assignment to Lawlor was a binding election on the part of the English firm to regard the contract as rescinded, and with reference to the attitude of the American company it was therein said:

"It is said, however, that the defendant did not elect to rescind the contract when the breach occurred, but, on the contrary, chose to keep it alive. That seems to be true. The action of the defendant in retaining the $36,000 of advances which it had received under the contract, but for which it had given no equivalent, is not consistent with an intention to disaffirm."

The referee said that this court so held "on substantially the same facts that are presented here." It must be remembered, however, that the questions were then presented in a very different form, and the point involved was entirely different and distinct. That was an appeal from an order where the right to a preliminary injunction was determined upon affidavits, and the question as to the right of the American company to resort to the provision in the contract of 1894 which entitled them to revive the contract of 1891 was neither considered nor passed upon.

The judgment must therefore be reversed, and a new trial had before another referee; the costs of appeal to appellants to abide event. All concur.